# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3810

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| Doran Dee Robinson, also known | * | |
| as Dee Robinson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 11, 2000
Filed: July 5, 2000

_____

Before BOWMAN and HANSEN, Circuit Judges, and CARMAN,[1] Judge.

_____

BOWMAN, Circuit Judge.

Doran Dee Robinson appeals his conviction and sentence for conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846 (1994). We affirm.

_____

[1]The Honorable Gregory W. Carman, Chief Judge, United States Court of International Trade, sitting by designation.

I.

We state the facts in the light most favorable to the jury's verdict. Robinson and Richard Housman were arrested in a reverse sting operation on December 15, 1997, in which Special Agent Dean Gibbs of the Drug Enforcement Agency attempted to sell them a pound of methamphetamine. The operation was orchestrated by Dave Mentzner, who, unknown to Robinson and Housman, was working as a confidential informant for the Nebraska State Patrol.

Mentzner first told Housman that Gibbs was coming to town with a pound of methamphetamine to sell. Housman then contacted several potential buyers, including Robinson, to inform them of the available methamphetamine. Approximately a week before the arrests, Robinson told Housman that he was interested in looking at the methamphetamine to purchase. Housman informed Robinson that Mentzner was asking $10,000 for the pound. Robinson replied that the price was "within range." A few days later, Robinson told Housman he wanted Housman to set up the meeting as soon as possible.

Housman set up the meeting for noon on December 15 at his house. Around 11:30 a.m. that day, Housman went to Robinson's house to let him know that the deal was set up. Robinson was not home at that time, and Housman returned to his house to let Mentzner and Gibbs know that Robinson was not available. They then agreed to meet again at 3:00 p.m. Housman returned to Robinson's house, where he found Robinson and informed him that the meeting was set up for 3:00 p.m. Housman also told Robinson that if Robinson bought the pound of methamphetamine, then he would want one ounce out of it as his cut. Robinson agreed to this arrangement.

Shortly before 3:00 p.m., Robinson and Housman went to Housman's house. Robinson informed Housman that he wanted to see and try the methamphetamine before he purchased it. Mentzner and Gibbs arrived in a van, and Mentzner told

-2-

Housman and Robinson that he wanted to do the deal in the van.  They all entered the van, where, after introductions were made, the following conversation was recorded by surveillance:

Robinson:          Well if we can look at it or if we can try it or if we can do something, I'd like to—

Gibbs:          I'd like to see the money first.

Robinson:          Well, I got the money.

Housman:          Show um both.

Robinson:          I can, I can show you the money all day long but that don't mean that I don't want to deal, you know, I just want to look at it.

Gibbs:          Okay.  There's ten there?

Robinson:          Uh, I have over ten on me, but then again it doesn't seal a deal cuz like I said, I wanted to see (inaudible) anyway.  But he said it's good shit, and I said if it's like that goddamn (inaudible)

Mentzner:          We had some stuff going around town here for a while that looked like some Nestle's Quik shit, it wasn't no good at all.

Robinson:          My girlfriend told me, she says, well if Dave's got it, it's gotta be good shit, cuz he wouldn't be fucking around with, you know, no dope.

Gibbs:          Well, let me get it.

Housman:          I've been a nervous fuckin wreck for (inaudible) I swear to god.

Robinson:          Hey you don't wanta get caught with this much (inaudible).  Ask him, he'll tell you.  It ruinned [sic] my motherfuckin life.  (inaudible)

Gibbs:          I put it down in the ground, so it could have a safe, keep this damn cooler open, we'll look at it.  Got it in bags here and, here you go.  (inaudible) You can cut into it if you want.

Robinson:          What's this on the outside?

Gibbs:          That's just mold and stuff.

Robinson:          You cut into it, it's your bag.

| | |
|---|---|
| Gibbs: | You sure? Alright. (inaudible) |
| Gibbs: | Yah, that's pretty good stuff. (inaudible) |
| Unknown: | Good god almighty. |

Trial Exhibit No. 2, Transcript of Conversation. At that point, the van was raided by the Nebraska State Patrol, and everyone was arrested.

During the course of the conversation, Robinson pulled a bundle of cash out of his jacket, and Gibbs removed the package of methamphetamine from a cooler in the back of the van. After Robinson indicated that he wanted to see or test the methamphetamine, Gibbs cut open the package with a knife provided by Housman. Before Robinson was able to test the methamphetamine, they all were arrested. A Jennings Bryco .38 automatic handgun and $11,066 in currency were found on Robinson at the time of the arrest.

Robinson and Housman were charged with conspiracy to distribute and possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine. In addition, Robinson was charged with two firearms offenses, and the United States sought to have the $11,066 in currency forfeited. Housman reached a plea agreement with the United States and testified at Robinson's trial. The United States dismissed one of the firearms charges before trial, and the District Court[2] dismissed the other firearms charge and the possession with intent to distribute charge at the close of the prosecution's case.

Robinson chose to testify in his defense. In short, Robinson testified that he was unaware of the methamphetamine until the day of the attempted sale, that he had no intention of buying the methamphetamine, and that he only went to see the

_____

[2] The Honorable William G. Cambridge, United States District Judge for the District of Nebraska.

-4-

methamphetamine because Housman insisted. He also testifed that there was an innocent explanation for the large amount of money found on him at the time of arrest. The money was in three bundles: $3,300 for plane tickets for his children to fly from Alaska to visit him, $5,600 for attorney's fees resulting from state drug charges, and the remainder in a third bundle.

The jury convicted Robinson of conspiracy to distribute and possess with intent to distribute methamphetamine and found that $10,000 of the currency was subject to forfeiture. At sentencing, the District Court applied enhancements under the United States Sentencing Guidelines for obstruction of justice under § 3C1.1 and for possession of a weapon during a drug trafficking offence under § 2D1.1. Robinson was sentenced to 188 months imprisonment to run consecutively to a sentence he currently is serving for a state drug conviction.

## II.

Robinson appeals his conviction and sentence. He argues that the evidence was insufficient to support the conviction for conspiracy to distribute and possess with intent to distribute methamphetamine and that the District Court erred in imposing the obstruction of justice enhancement, in imposing the weapon enhancement, and in imposing the consecutive sentence. We address these four arguments in turn.

## A.

We review the sufficiency of the evidence de novo, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences. We reverse only if no reasonable jury could have found Robinson guilty beyond a reasonable doubt on each essential element of the charge. To support Robinson's conviction for conspiracy under 21 U.S.C. § 846, there must be evidence that Robinson entered into an agreement with at least one other person and

that the agreement had as its objective a violation of the law.  See United States v. Maejia, 928 F.2d 810, 813 (8th Cir. 1991).  Section 846 does not require proof of an overt act in furtherance of the conspiracy.  See United States v. Covos, 872 F.2d 805, 809-10 (8th Cir.), cert. denied, 493 U.S. 840 (1989).  In essence, there must be evidence that Robinson entered into an agreement with Housman and that the purpose of that agreement was to purchase and distribute the methamphetamine.  The conspiracy may be proved through circumstantial evidence.  See United States v. Gooden, 892 F.2d 725, 729 (8th Cir. 1989) ("The nature of the offense of conspiracy with its necessary aspect of secrecy often requires that the agreement be implied from the surrounding circumstances."), cert. denied, 496 U.S. 908 (1990).

Not only is there circumstantial evidence of the conspiracy in this case—namely, that Housman brought Robinson to meet the supposed methamphetamine dealers, that Robinson had the required amount of cash on him, and that Robinson asked to see the methamphetamine—but there also is direct evidence.  Housman testified he contacted Robinson about the available methamphetamine, that Robinson was interested in it, and that the price generally was acceptable to Robinson.  Furthermore, Housman testified that Robinson agreed to give him a cut of the methamphetamine if it was acceptable as sort of a finders fee.  Robinson argues that, at most, the evidence only supports the conclusion that he agreed with Housman to look at the methamphetamine.  While this may be true in a literal sense—that is, Robinson was careful not to commit to the purchase until after he had inspected the methamphetamine and the Nebraska State Patrol apparently precluded him from doing so—Robinson's argument misses the point.  The jury was entitled to infer that Robinson agreed to look at the methamphetamine because his purpose was to purchase methamphetamine.  That Robinson never agreed to purchase the methamphetamine from Gibbs is not dispositive.  The agreement at issue in the conspiracy charge was not between Robinson and Gibbs or Mentzner, but between Robinson and Housman. And we believe the evidence was more than sufficient for a jury to reasonably infer that Robinson and Housman had an agreement and that the purpose of the agreement was to purchase and distribute

methamphetamine.[3]

_____

[3] Robinson's argument that the evidence was insufficient because he never agreed to actually purchase the methamphetamine relies principally on United States v. Joyce, 693 F.2d 838 (8th Cir. 1982). In that case, a government informant contacted Joyce to inform him that a pound of cocaine was available for purchase in St. Louis. Joyce flew from Oklahoma City to St. Louis the next day with $22,000, an amount they had agreed would be more than sufficient to purchase the cocaine. Joyce met the informant and an undercover officer in a hotel. Joyce expressed his interest in dealing, and they agreed on a price of $20,000 for a pound of cocaine. The officer went to retrieve the cocaine and returned with a duct tape wrapped plastic package. Joyce wanted the officer to unwrap the package so that he could see the cocaine. The officer, however, insisted on seeing Joyce's money. They reached an impasse, and as Joyce left the hotel, he was arrested. Joyce was convicted of attempting to possess cocaine with intent to distribute. On appeal, this Circuit reversed, holding that "[w]hatever intention Joyce had to procure cocaine was abandoned prior to the commission of a necessary and substantial step to effectuate the purchase of cocaine." Id. at 841. Joyce's motive for refusing to purchase the cocaine was deemed not "particularly relevant." Id. at 843.

Our decision in Joyce has been roundly criticized by other circuits. See United States v. Dworken, 855 F.2d 12, 22 (1st Cir. 1988) ("There was no complete and voluntary renunciation of the general criminal intent to possess narcotics [in Joyce], merely a desisting in the attempts to purchase the narcotics in question, for fear of government involvement."); United States v. McDowell, 714 F.2d 106, 107 (11th Cir. 1983) (per curiam) ("Refusal to purchase because of inability to agree on price, or dissatisfaction about quality, or lack of opportunity to inspect is not necessarily a complete and voluntary renunciation of criminal purpose."). Nevertheless, absent a decision of this Court en banc, Joyce is the law of the circuit, and we must decide this case accordingly.

We believe Joyce is readily distinguishable from the present case and does not govern it. The key lies in the difference between the law of attempt and the law of conspiracy. Under the law of attempt, a substantial step is required in order for the defendant to be convicted. In contrast, conspiracy under 21 U.S.C. § 846 does not require an overt act. Furthermore, the implications of an abandonment and withdrawal are entirely different in attempt and conspiracy cases. In an attempt case, abandonment precludes liability for the attempt. In contrast, withdrawal in a conspiracy case only precludes liability for subsequent criminal acts committed by coconspirators, but does not preclude liability for the conspiracy itself. See United States v. Francis, 916 F.2d

Robinson next argues that the District Court's finding of perjury that resulted in a sentencing enhancement for obstruction of justice under § 3C1.1 was error because the court's findings were unsupported by the record and were insufficiently detailed. See United States v. Dunnigan, 507 U.S. 87, 94-95 (1993) (requiring district court to review the evidence and make independent findings necessary to establish perjury under definition requiring falsity, materiality, and willfulness). Here, the District Court stated:

> Paragraph 20 [of the Presentence Report] is a finding that the defendant obstructed justice because his testimony was not truthful, and I agree with that finding. It wasn't. His testimony was not truthful regarding material facts in this case; and therefore, the two-level enhancement is applicable under United States Sentencing Guideline Section 3C1.1.

Transcript of Proceedings at 358-59. Paragraph 20 of the Presentence Report compared the testimony of Robinson and Housman and concluded that Robinson's testimony was not truthful regarding material facts of the case. We believe that the finding of the District Court, which implicitly adopted the findings of the Presentence Report, is supported adequately by the record and thus was not clear error. See United States v. Big Crow, 74 F.3d 163, 166 (8th Cir. 1996) (standard of review). Furthermore, the District Court's failure to specifically find Robinson's false statements to be willful was a "failure in form alone, insufficient to warrant remand." United States v. Taylor, 207 F.3d 452, 455 (8th Cir. 2000) (reviewing record and concluding that false trial testimony was willful after district court failed to make explicit willfulness finding); accord United States v. Lambros, 65 F.3d 698, 702 (8th Cir.

---

464, 466 (8th Cir. 1990). Had Robinson walked away from the drug deal before the police moved in, as Joyce did, that would not somehow preclude his liability for the conspiracy itself even if it constituted a valid withdrawal.

1995), <u>cert. denied</u>, 516 U.S. 1082 (1996).  Robinson's statements of his intention to use the money for other purposes and his intention not to buy the methamphetamine could not have been the result of confusion, mistake, or faulty memory.  <u>See</u> United States Sentencing Guidelines Manual § 3C1.1 commentary (n.2) (1998).  Rather, these false statements could only have been the result of a willful intent to deceive the jury and obstruct the judicial process.

## C.

In a related argument, Robinson challenges the District Court's application of a two-level enhancement for possession of a firearm during the commission of a drug offense under § 2D1.1(b)(1) because the court failed to make specific findings  other than his statement that "it is not clearly improbable that the weapon was connected with the offense."  Transcript of Proceedings at 359.  The court's language tracks the commentary of § 2D1.1, which states: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  United States Sentencing Guidelines Manual § 2D1.1 commentary (n.3). We believe the District Court's abbreviated statement must not be viewed in a vacuum. First, the evidence that Robinson possessed the weapon at the time of the offense, including the admission of the weapon itself into evidence and an arresting officer's testimony that he found the weapon on Robinson at the time of the arrest, was uncontested.  Second, Robinson presented no evidence at trial or sentencing that he was in possession of the weapon for any legitimate reason.[4]  In the circumstances, we believe the District Court's finding was sufficient.

---

[4] Robinson apparently was prepared at trial to produce evidence that he merely was delivering the gun to a friend who was afraid for her safety because her husband had been attacked in front of their home.  After the husband began to testify, however, the court reminded Robinson that the gun charges had been dismissed, and that testimony was stricken from the record on Robinson's motion.  <u>See</u> Transcript of Proceedings at 232.

D.

Last, Robinson argues that the District Court erred in imposing his sentence consecutively to his undischarged state term of imprisonment. We disagree. Robinson had pled guilty to the state offense, but had not yet been sentenced, and the conduct underlying that offense was not taken into account in the determination of the offense level for the instant offense; thus, the broad directive of § 5G1.3(c) to formulate a reasonable sentence applied. The court considered the factors of 18 U.S.C. § 3553(a) as required by 18 U.S.C. § 3584. See United States Sentencing Guidelines Manual § 5G1.3 commentary (n.3) (arguably directing court to consider every factor relevant to sentencing including factors related to the undischarged sentence). We cannot conclude that the District Court's decision to impose the sentence consecutively was unreasonable.

III.

Having found no error in Robinson's conviction or sentence, we affirm.

A true copy.

    Attest:

      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.