**UNITED STATES of America Plaintiff,**

v.

**Joseph DODD, Defendant,**

**No. CRIM.03–18.**

United States District Court, S.D. Iowa.

Jan. 7, 2004.

Clifford R. Cronk, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

Ted E. Breckenfelder, Breckenfelder Law Firm, Murray W. Bell, Davenport, IA, Donovan S. Robertson, Rock Island, IL, Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Thomas J. O'Flaherty, O'Flaherty Law Firm, Swisher, IA, for Defendants.

### ORDER

PRATT, District Judge.

Before the Court is Defendant Joseph Dodd's Motion for New Trial (Clerk's No. 175). The Government resists the motion and the matter is fully submitted.

### I. BACKGROUND

On September 3, 2003, Defendant was found guilty by jury verdict of conspiracy to distribute cocaine and cocaine base. The jury found that it was not reasonably foreseeable to Defendant that 500 grams or more of a mixture or substance containing cocaine would be distributed in the course of the conspiracy, but that it was reasonably foreseeable to Defendant that 5 grams or more of cocaine base would be distributed. In support of his motion for new trial, Defendant asserts that the jury verdict in this matter was contrary to the weight of the evidence presented at trial.

### II. STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 provides, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The District Court is granted broad discretion in passing upon motions for new trial and its decision is subject to reversal only for a clear abuse of discretion. *See United States v. Cannon,* 88 F.3d 1495, 1502 (8th Cir.1996); *United States v. Blumeyer,* 62 F.3d 1013, 1015 (8th Cir.1995). Unlike a motion pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal, the Court need not consider the evidence on a Rule 33 motion for new trial in the light most favorable to the Government. Rather, in assessing whether Defendant is entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *United States v. Davis,* 103 F.3d 660, 668 (8th Cir.1996); *United States v. Lanier,* 838 F.2d 281, 284–85 (8th Cir.1988) (per curiam). As the Eighth Circuit Court of Appeals explained in *United States v. Rodriguez:*

"When a motion for a new trial is made on the ground that the verdict is con-

trary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is whether he is entitled to a new trial. In assessing the defendant's right to a new trial, the court must weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln,* 630 F.2d 1313, 1316 (8th Cir.1980). The court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. We will not reverse the district court's decision absent a clear and manifest abuse of discretion. *United States v. Bonadonna,* 775 F.2d 949, 957 (8th Cir.1985); *United States v. Ferguson,* 776 F.2d 217, 225 (8th Cir.1985); *United States v. Bohn,* 508 F.2d 1145, 1150 (8th Cir.1975).

*United States v. Rodriguez,* 812 F.2d 414, 417 (8th Cir.1987). The Eighth Circuit has also warned, however, that the authority to grant a Rule 33 motion for new trial "should be used sparingly and with caution." *Lincoln,* 630 F.2d at 1319. Nonetheless, if the Court finds that:

> [D]espite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [the district court] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*United States v. Huerta–Orozco,* 272 F.3d 561, 565 (8th Cir.2001) (quoting *Lincoln,* 630 F.2d at 1319).

To convict Defendant of conspiracy to distribute controlled substances, in violation of 21 United States Code, Sections 841(a)(1) and 846, it is necessary that the Government prove the following: 1) that Defendant and some other individual reached an agreement or came to an understanding to knowingly and intentionally distribute cocaine and cocaine base; 2) that the Defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and 3) that at the time the Defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding. *See* Court's Final Jury Ins. No. 9; *United States v. Beckman,* 222 F.3d 512, 522 (8th Cir.2000) (in a conspiracy case, the government must prove there was a conspiracy with an illegal purpose, that the defendant was aware of the conspiracy, and that he knowingly became a part of it); *United States v. Robinson,* 217 F.3d 560, 564 (8th Cir.2000) (there must be evidence that the defendant entered into an agreement with at least one other person and that the agreement had as its objective a violation of law); *United States v. Mosby,* 177 F.3d 1067, 1069 (8th Cir.1999); *United States v. Bass,* 121 F.3d 1218, 1220 (8th Cir.1997).

Defendant claims in his motion for new trial that the evidence in this case is unusual in that, "with one suspect exception, no physical evidence was put on the table. The Government's case was built entirely on the questionable word of several criminal informants."[1] Def.'s Br. in Support of Mot. at 2. The Government, on the other hand, argues that Defendant's position constitutes a "gross overstatement" of the record and that there was more than adequate evidence presented at trial to sustain the Defendant's conviction. The Court has carefully read and reread the transcript of

---

1. The suspect exception referred to by Defendant is presumably the baggie of crack found during Defendant's arrest on January 23, 2002. The evidence was destroyed prior to trial and is discussed in more detail *infra.*

the testimony in this matter and now turns to the specific evidence presented at trial.

## III. EVIDENCE

Testimony in this matter commenced on August 26, 2003 and the Government's case in chief concluded on August 29, 2003. During those four days, approximately 38 witnesses testified regarding an alleged drug conspiracy between three Defendants: Joseph Dodd, his nephew Frederick Dodd, and Elijah Hayes. Also alleged to be part of the conspiracy were numerous other individuals who were not on trial, including Joseph Dodd's brother, Anthony, Aikins Frimpong, Willie Harris, Miko Davis, and Shauna Collins, amongst others.

Evidence at trial overwhelmingly portrayed Frederick Dodd as the "ringleader" of a relatively large-scale powder and crack cocaine distributing operation. With few exceptions, each civilian witness testified about Frederick and their personal experiences with him in obtaining crack and powder cocaine for purposes of resale. These same witnesses identified Joseph Dodd as Frederick's uncle and noted that his street name was "Shakespeare." Numerous law enforcement personnel testified regarding search warrants and controlled buys from residences where Frederick Dodd was known to reside or to conduct substantial trafficking activity.

During trial, the Court postponed consideration of Joseph Dodd's Rule 29 Motion for Judgment of Acquittal after the conclusion of the Government's case. After the defense testimony concluded, the Court denied the Defendant's mid-trial and end of trial acquittal motions, while noting its opinion that the evidence against Joseph Dodd was "thin" at best. Of the numerous witnesses who testified, the Court will now discuss the evidence of each as it pertained to Joseph Dodd.

### A. *Willie Harris*

Willie Harris testified that he knew Joseph Dodd, but that he had never seen him with drugs, nor had he ever purchased any drugs from him.

### B. *Anthony Dodd*

Anthony Dodd testified that he is the brother of Joseph Dodd and the uncle of Frederick Dodd. Anthony was commonly referred to on the street as "T," "Big T," and sometimes "Tim." He first became involved in drugs in approximately 1985 and moved to Clinton, Iowa in approximately 1990 or 1991. Anthony testified that Joseph was not in Clinton when he first moved there. Upon arriving in Clinton, Anthony was aware that his nephew, Frederick, was selling powder cocaine and Anthony, himself, also began selling drugs. Some of the drugs he distributed were provided by Frederick Dodd, and Anthony later discovered that Frederick's source of supply was an individual in Chicago. Anthony went to prison for a period of time and was released in 1994. He returned to Davenport, Iowa and resumed selling drugs with Frederick. Joseph was not in the area. In 1998, Anthony was again arrested for selling crack cocaine, sentenced to prison, and was released in June 2001. At that time, he moved to Chicago for a few months and ultimately returned to Davenport where he moved into the Trinity Apartments and resumed trafficking narcotics with Frederick. Again, Joseph Dodd was not around when Anthony first moved to the Trinity Apartments.

According to Anthony, there finally came a time when Joseph came to the Trinity apartments:

Q. Did there come a time when Joe Dodd came to the Trinity apartments?

A. Yes.

Q. For what reason?

A. To hang with me for a while to kick it.

Q. To get high and kick it? What does kick it mean?

A. Mess with females.

Q. Was Joe Dodd getting crack cocaine?

A. I believe so.

Q. Well, did you see him with it?

A. Yes, I did.

Q. How did he get it?

A. I believe from a nephew.

Q. That would be Fred?

A. Yes.

Q. Did you see him get it from Fred?

A. Several times

Q. Was he getting enough to sell some?

A. Yes

Q. Was he selling it too?

A. Yes.

Trial Tr. (Test. of Anthony Dodd).

Later in his testimony, Anthony noted that Joseph Dodd did not live at the Trinity Apartments, but rather lived in a house frequented by crack users. When asked what Joseph was doing over there, Anthony responded, "Using crack and messing with females." *Id.* The AUSA then asked, "Was he distributing crack to those people?" Anthony replied, "I believe so." *Id.* Anthony did not give any details about the basis for his belief that Joseph Dodd was selling crack cocaine, nor did he ever give any specifics as to time, place, or quantity.

On February 12, 2002, Anthony was arrested by the Davenport police after a search of his residence at the Trinity Apartments. At the time of the search, Anthony lived in apartment number five and was selling drugs out of his nephew, Frederick's, apartment in the same building. Defendant pleaded guilty conspiracy to distribute controlled substances in the present case and agreed to cooperate with authorities in hopes of receiving substantial assistance.

### C. *Melvin Yancy*

Melvin Yancy testified pursuant to an immunity agreement with the Government. He stated that in 1993, he began selling drugs with Frederick Dodd. Melvin testified that Joseph Dodd sometimes stayed at Frederick's place. When asked how Joseph Dodd got money, Melvin replied, "Sometimes he dealt drugs to get money." Trial Tr. (Test. of Melvin Yancy). Melvin gave no details as to time, place, quantity, or specific sales that he had witnessed. Later in his testimony, Melvin replied "Yes" to the question, "Was he [Joseph Dodd] getting drugs and selling them, though, out there with you guys from time to time?" *Id.* Finally, when asked "Who all was selling for Fred besides you?," Melvin replied, "Sometimes his uncles will . . . Shakespeare and Anthony." *Id.*

### D. *Kathy Liggins*

Kathy Liggins testified that in the late 1980s into the early 1990s, she received powder cocaine from Joseph Dodd. Ms. Liggins later specified that she received drugs primarily prior to 1990, but that "it might have ran into early 90." Trial Tr. (Test. of Kathy Liggins). Ms. Liggins assumed that Joseph Dodd was getting his drugs from Frederick Dodd.

### E. *Heidi Jungwirth*

Heidi Jungwirth testified that she was involved in an intimate relationship with Frederick Dodd from approximately September 1997 to December 2002. On occasion, she and Frederick would give Joseph a ride to his home. She stated that she had seen Joseph Dodd with drugs:

Q. And where did those come from? How did you see them?

A. He had-he had-he had them on himself, is that you mean?

Q. All right. How did you see that?

A. Like when they left Fred's one time there was some that I believe he put in his pocket. I am not sure. I'm not sure how-I don't-

Q. Let's go over that. When they left where?

A. I don't know-I am not for sure if I have ever actually-I have seen him with drugs, but I don't remember where.

Trial Tr. (Test. of Heidi Jungwirth).

When asked whether Joseph Dodd was ever present while crack was being "cooked" at Frederick's residence, Jungwirth replied, "I believe so. I don't know for sure." *Id.*

### F. *Officers Matthew Edwards and Eduardo Starks*

Officers Matthew Edwards and Eduardo Starks testified that on January 23, 2002, Joseph Dodd was driving a maroon Mercury with no taillights. Officer Edwards conducted a traffic stop and the Defendant gave the name "Jerry Little." After some inquiry, Officer Edwards asked if there was anyone that could verify his identity. Joseph Dodd told them about a house on Third Avenue in Rock Island. Officer Starks arrived at the scene and conducted a pat-down search of the Defendant. When he felt a ball in Defendant's pocket, Officer Starks removed the item and discovered that it was a handkerchief. Nothing was inside the handkerchief and Officer Starks replaced it in Defendant's pocket. When Officer Starks went to place Defendant in his squad car, there was a baggie of cocaine on the ground, later determined to be approximately 2.8 grams. A search of the vehicle Defendant was driving revealed a small digital scale under the driver's seat. The scale had cocaine residue on it. Upon arriving at the Third Avenue house, Sharon Stokes answered the door and told the officers that the person in custody was "Shakespeare" and that the maroon Mercury was hers, but that she occasionally let him borrow it. Neither the scale nor the baggie were ever tested for fingerprints.

### G. *Sharon Stokes*

Sharon Stokes testified that she first moved to Iowa in November 1997. She got involved with crack cocaine in late 1998 and met Joseph Dodd in approximately January 2000. Stokes stated that she sometimes bought crack cocaine from Frederick Dodd either at her home at 1013 Third Avenue in Rock Island or at one of Frederick Dodd's residences. A few months after she met Joseph, she discovered that he was involved with drugs. At some point in time, Stokes and her boyfriend, George Butler, rented a room in their home to Joseph Dodd. The home was a place where many people came to use crack cocaine. With regard to the January 23, 2002 arrest of Joseph Dodd, Stokes testified that the vehicle he was driving belonged to her and that she had received it from her father. She stated that the digital scale under the seat did not belong to her or to her father. Stokes testified:

Q. Did Joe Dodd ever go to 1013 Third Avenue?

A. Yes

Q. When he was there did he have crack cocaine?

A. I couldn't prove it, but I would say yes.

Q. Why do you say yes?

A. He would share what he had.

Q. Did he share it with you?

A. Sometimes.

Q. Did he share it with other people there?

A. Sometimes

Q. Was he selling it there?

A. I'd say yes.

Q. How many times did you get drugs from Joseph Dodd, from Shakespeare?

A. Are you asking me how many times I got it or how many times I bought it?

Q. How many times you got it.

A. Got it. Again, I couldn't be specific. I don't know what number to put on it. More than 10.

Q. Would it be more than 20?

A. Could possibly be.

Q. Were there times when it was just you getting it from him as opposed to him selling it to other people around you?

A. Yes.

Trial Tr. (Test. of Sharon Stokes)

Later in her testimony, Stokes was asked to name people who were bringing crack to the home at 1013 Third Avenue and distributing it. Stokes replied, "I can name one ... Joseph Dodd." *Id.* Stokes stated that Joseph Dodd was a crack user and that he would sometimes give her a piece of his crack cocaine to smoke. She stated that on the few occasions when she bought crack from Joseph, it was loose, *i.e.,* not packaged and that Joseph just broke off a piece and gave it to her.

## H. *George Butler*

George Butler testified that Joseph Dodd needed a place to stay, so he rented him a room at the home he shared with Sharon Stokes. Butler testified that he occasionally got "bumps" of crack from Joseph where Joseph would just break off a piece and give it to him. Butler testified that he saw Joseph with baby food jars and assumed that Joseph was reducing cocaine powder to crack cocaine based on his own drug experiences. Butler testified that he never saw Joseph cook crack cocaine and never saw Joseph actually sell crack to anyone else. When asked, "Was he distributing crack to other people?" Butler responded, "He had ladies come in, go in the room with him," but that he never saw anything. Trial Tr. (Test. of George Butler). Butler testified that in April 2002, he phoned 911 because Joseph put a gun to his head. An ultimate search of his home on that day revealed a gun hidden in the bathroom. Butler was arrested for possession of that firearm by a felon. Butler testified that authorities also took baby food jars out of Joseph Dodd's room and that, at the time of the search, five or six other people were in the small house.

## I. *Officer Larry Hufford*

Officer Larry Hufford testified that he responded to a 911 hang-up call at 1013 Third Avenue in Rock Island, Illinois on April 4, 2002. Joseph Dodd answered the door about six inches, said no one called 911, and closed and locked the door. Officer Hufford called for backup and knocked on the door again. George Butler opened the door about a foot. Officer Hufford testified that Joseph Dodd was sitting about ten feet away from the door and was holding a cell phone to his face and covering his face with his fingers. Hufford stated, "it looked like he was hiding from me." Trial Tr. (Test. of Larry Hufford). Hufford arrested Joseph and placed him in the squad car. He returned to the house where approximately eight or nine people were present and searched the residence after speaking to George Butler. Hufford found three baggie corners with residue in a doorway, baby food jars with residue in the bedroom belonging to Joseph Dodd, and a gun in the bathroom. The gun was sent for fingerprints, but none were suitable for identification. When Hufford returned to his squad car, he found that Joseph Dodd had broken out the window and escaped. Joseph Dodd was re-arrested the next morning.

### J. *Vernard Gillman*

Vernard Gillman testified regarding Joseph Dodd's arrest the morning following his escape from Officer Hufford's squad car.

### K. *Gina Clark*

Gina Clark testified that she oversaw several controlled buys of narcotics by Deb Cunningham. Cunningham would go to the Trinity Apartments and purchase crack cocaine from Frederick Dodd. On February 9, Clark testified that an individual was standing outside the main door to the apartments. Clark believed the person was Joseph Dodd and that he was performing counter-surveillance. The individual escorted Ms. Cunningham out of the building and asked Clark if she would accept $5 so that he could come into her vehicle and get high. According to Clark, Deb Cunningham had told her that she knocked on the door and saw Joseph Dodd. She asked him where Frederick was and Joseph responded that he was in Apartment # 3. Clark testified that based on the controlled buys, a search warrant was eventually executed at the Trinity Apartments. There was no evidence that Joseph lived there and no fingerprint evidence. At the time of the controlled buys, Clark did not personally know either Anthony or Joseph Dodd. She did, however, know that Deb Cunningham believed the two were twins. Clark admitted on cross-examination that her identification of Joseph Dodd on February 9 was based on the word of Deb Cunningham who was admittedly confused.

### L. *Deb Cunningham*

Deb Cunningham testified that the person standing in the doorway during her controlled buy on February 9 was "Shakespeare." She stated that Shakespeare thought that Frederick had loaned her his car and asked to come in and get high. Cunningham stated that she had bought drugs from both Shakespeare and "Tim," though she did not identify when, where, or what quantities. During trial, Cunningham identified Joseph Dodd as "T"[2] and stated that she believed Anthony and Joseph were twins and that she really could not tell the two apart.

### M. *Shauna Collins*

Shauna Collins testified regarding her relationship with Frederick Dodd and how she came to sell drugs for him. She stated that she had seen both of Frederick's uncles with crack and that there was enough to sell. She also stated that she believed that Anthony and Joseph Dodd were twins. On cross-examination, Collins admitted that, prior to trial, she had not revealed to police any information about Joseph Dodd holding drugs. No testimony was elicited from Collins regarding the quantity of cocaine she had allegedly observed Joseph Dodd with and what led her to believe that the amount was enough to sell.

### N. *Joni Little*

Joni Little testified that she is a forensic scientist with the Illinois State Police Forensic Science Lab. She stated that she received the substance relating to Joseph Dodd's arrest on January 23, 2002 and determined that the substance in the baggie was positive for the presence of cocaine. Ms. Little did not test the substance to determine if it was, in fact, crack cocaine, and this evidence was destroyed prior to trial in this case.

### O. *Michael Dasso*

Michael Dasso testified regarding telephone communications between the alleged members of the conspiracy. Despite very compelling evidence about the length and

---

**2.** "T" is a street nickname for Anthony Dodd.

number of calls between alleged coconspirators, Dasso admitted that there were absolutely no phone records linking Joseph Dodd to any other alleged conspirator.

P. *Roger Vernoy*

Roger Vernoy testified that 1.5 grams of crack cocaine is a very small amount, but that it could be consistent with a salable quantity of crack cocaine, particularly when coupled with the presence of a digital scale. Vernoy also stated, however, that depending on the individual, it could be a consumer amount of cocaine.

## IV. ANALYSIS

■■■ "In order to prove the existence of a conspiracy, 'the government must show an agreement between at least two people and that the agreement's objective was a violation of the law.'" *United States v. Jenkins,* 78 F.3d 1283, 1287 (8th Cir.1996) (quoting *United States v. Escobar,* 50 F.3d 1414, 1419 (8th Cir.1995)). Proof of a formal agreement is unnecessary. *United States v. Hoelscher,* 914 F.2d 1527, 1534 (8th Cir.1990). A tacit understanding is sufficient and can be proved by direct or circumstantial evidence. *Jenkins,* 78 F.3d at 1287. Evidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy. *United States v. Ivey,* 915 F.2d 380, 384 (8th Cir.1990); *accord United States v. Sparks,* 949 F.2d 1023, 1027 (8th Cir.1991) ("Although not sufficient by itself, association or acquaintance among the defendants supports an inference of conspiracy.").

■■■ "Once the government establishes the existence of a drug conspiracy, only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support the conviction." *Beckman,* 222 F.3d at 521 (quoting *Mosby,* 177 F.3d at 1069). Mere presence, however, even when coupled with knowledge that someone else who intends to sell drugs is present, is insufficient to establish membership in a conspiracy. *United States v. Shoffner,* 71 F.3d 1429, 1433–34 (8th Cir.1995); *see also United States v. Rork,* 981 F.2d 314, 316 (8th Cir.1992) (holding that defendant's knowledge of drug deal and presence during the transaction was insufficient to support conviction for conspiracy); *United States v. Melchor–Lopez,* 627 F.2d 886, 891 (9th Cir.1980) ("[T]here can be no conviction for guilt by association, and it is clear that mere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator.").

In this case, the Court has no doubt that the Government's evidence proved beyond a reasonable doubt that Frederick Dodd was the ringleader of a conspiracy to distribute cocaine and crack cocaine. The evidence also proved beyond a reasonable doubt that Joseph Dodd was an avid crack cocaine user and addict. Similarly, the Government's evidence could support a jury's conclusion, beyond a reasonable doubt, that the Defendant sold cocaine or crack cocaine on certain occasions and certainly that he shared it with others on numerous occasions.

Joseph Dodd was not, however, charged with distributing cocaine or crack cocaine or with being an illegal user of controlled substances. The sole count of the Indictment, as charged against Joseph Dodd, alleged that from a date unknown, but beginning sometime in 1992 or earlier, and continuing to on or about January 5, 2003, in and about Scott and Clinton Counties, in the Southern District of Iowa and else-

where, two or more persons, including the defendants, Frederick Dodd, Elijah Hayes, and Joseph Dodd, did knowingly and intentionally *conspire* to commit offenses against the United States, specifically to knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing cocaine and 50 grams or more of a mixture or substance containing cocaine base, also known as "crack," both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A) and (B).

■ As noted, the trial testimony as a whole very clearly established the existence of a conspiracy. Another reasonable inference from the testimony is that Joseph Dodd knew of the activities of his nephew and countless others in selling crack and powder cocaine. The government, however, cannot rely on Joseph Dodd's mere knowledge of the existence of a conspiracy. Rather, "it must establish some degree of knowing involvement and cooperation." *United States v. Casas*, 999 F.2d 1225, 1229 (8th Cir.1993). To this end, the Government claims that it has met its burden through: 1) testimony by Officers Edwards and Starks that they arrested Defendant with a distributable amount of crack cocaine and an electronic scale and that Defendant gave a false name when arrested; 2) testimony by Officer Hufford that a search of defendant's residence revealed a gun "attributed to Joseph Dodd," baby food jars with cocaine residue, and the fact that Defendant broke out the window of Hufford's vehicle and fled; 3) testimony by Gina Clark identifying Joseph Dodd as present during a drug transaction at the Trinity Apartments; 4) testimony by Anthony Dodd, Shauna Collins, George Butler, Sharon Stokes, Debra Cunningham, Melvin Yancy, and Kathy Liggins regarding Joseph Dodd's involvement with the distribution of crack cocaine. The Court disagrees.

First, the court finds testimony by Officers Edwards and Starks insufficient to show that the crack they located on the ground was actually possessed by Joseph Dodd. Even assuming that the crack did belong to the Defendant, the Court is deeply troubled by the destruction of the evidence prior to trial. Additionally, no fingerprints were obtained from either the baggie or from the digital scale found under the seat of a borrowed vehicle. Indeed, Sharon Stokes testified that the vehicle was hers and that Joseph Dodd had simply borrowed it. While Stokes claimed that the scale found under the seat did not belong to her, it is undisputed that Stokes and her boyfriend were both crack cocaine addicts. What's more, the testimony adduced at trial supported both the conclusion that the quantity of crack cocaine in the baggie was a distributable amount and that it may be a user quantity depending on the individual. There is no question that the contents of the baggie were not prepared for resale.

Next, the Court is troubled by the Government's conclusion that the gun found in the search of 1013 Third Avenue is "attributed to Joseph Dodd." The only testimony linking the gun to Joseph Dodd comes from George Butler. Butler stated that the Defendant had held the gun to his temple not long before the police search of the property. No fingerprints were ever recovered from the gun and numerous other people were present at the property prior to police finding the weapon. No witness other than George Butler ever indicated Joseph Dodd had a gun and George Butler himself was arrested for possessing the very same firearm as a felon. Indeed, Butler's testimony supports an inference that he never actually, or at

best barely, saw the weapon that Joseph Dodd supposedly held to his head:

Q. Had you seen the gun before [the police] found it?

A. Only time I saw the gun was when I felt it against my temple.

Q. If I showed you a gun now, would you recognize it?

A. I can't say I would, sir.

Trial Tr. (Test. of George Butler). Additionally, the fact that baby food jars with cocaine residue were found in Joseph Dodd's room is not as compelling as the Government argues. According to officer testimony, eight or nine other individuals were present in the Third Street residence at the time it was searched, including George Butler and Sharon Stokes who are both admitted crack cocaine addicts. Testimony presented at trial explained that baby food jars are often used to convert powder cocaine to crack cocaine, but the Court is not aware of any evidence presented that would lead to the conclusion that making such a conversion necessarily, or even likely means that an individual is going to sell the finished crack cocaine. The fact that the jars were found in Defendant's room carries significantly less weight in light of the fact that numerous crack addicts frequented the residence[3] and no fingerprint analysis was ever performed. Even assuming that the jars did belong to the Defendant, which is not an unreasonable inference, it seems equally plausible that defendant was converting powder to crack cocaine for his personal use and to support his own drug addiction.

The Court finds the testimony of Gina Clark equally unconvincing. The controlled buys were performed at nighttime when visibility from the surveillance vehicle was poor. Clark's identification of Jo-seph Dodd was based on information she received from her confidential informant, Deb Cunningham, who was admittedly confused about the identities of Joseph and his brother Anthony. Even assuming that Clark was correct in believing the individual she suspected of counter-surveillance was Joseph Dodd, the evidence equally supports a contrary conclusion, i.e., Joseph Dodd was merely present at the scene of a drug transaction. This is bolstered by the fact that he accompanied Deb Cunningham out of the building and asked Detective Clark if he could get high in her vehicle. This fact alone weighs heavily against a conclusion that the individual in the doorway, whether Joseph or Anthony Dodd, was conducting counter-surveillance.

Finally, the Government is correct that several individuals testified about Joseph Dodd's involvement with crack cocaine. As the Court noted previously, however, the Government case would be much stronger were Defendant charged with distributing controlled substances rather than with *conspiring* to distribute controlled substances. Simply put, the Court does not believe the Government adequately proved an "agreement" with Frederick Dodd to distribute crack cocaine, or that Joseph Dodd voluntarily and knowingly joined in an agreement with Frederick Dodd to distribute crack cocaine, elements necessary to sustain his conviction.

The Government's claim that numerous witnesses testified about Joseph Dodd's drug activities overlooks the quality of each witness's testimony. Shauna Collins merely testified that she had seen Joseph Dodd with enough crack to sell. However, Ms. Collins never testified that Joseph Dodd actually sold crack, nor did she indicate how much crack she had seen him with. Expert testimony revealed that cer-

---

**3.** George Butler testified that Joseph Dodd's room was only separated from the rest of the house by a red blanket and that various persons frequented the room.

tain salable quantities of crack cocaine may be personal use quantities depending on the user. Additionally, Ms. Collins' testimony is plagued by the same problem as Deb Cunningham's testimony, *i.e.*, she believed that Anthony Dodd and Joseph Dodd were twins and had great difficulty distinguishing the two.

The Government also cites Kathy Liggins as implicating the Defendant in selling cocaine. Ms. Liggins' testimony simply cannot carry the weight the government proposes, however. Her testimony at trial spoke of drug sharing and sales with Joseph Dodd only in the late 1980s and the beginning of 1990. The indictment in this case alleges the conspiracy began in 1992. Thus, Ms. Liggins' knowledge of drug activity substantially predates the time frame alleged in the indictment.

The Government correctly states that both George Butler and Sharon Stokes received crack directly from Joseph Dodd, but the testimony is far more consistent with that of one drug addict getting high with another drug addict. Even taking Stokes' and Butler's testimony at face value, there is nothing they said at trial that indicates Joseph Dodd had any agreement whatsoever with Frederick Dodd to sell crack. Additionally, the Court found Ms. Stokes' testimony to be evasive, defensive and generally uncredible. Neither Stokes nor Butler presented testimony regarding Joseph Dodd's source for crack cocaine and Butler admitted never having seen a sale, a cook, or any sort of transaction.

Melvin Yancy's testimony was troublesome in that he never identified with any particularity a single occasion when Joseph Dodd sold crack on behalf of Frederick Dodd. Indeed, Yancy specifically tempered his testimony about Joseph by stating that he sold crack "only to get money." Yancy testified under grant of immunity for activities that occurred ten years prior to the date of trial. The Court has great concern with Mr. Yancy's credibility and frankly found him to be a less than believable witness in much of his testimony.

Finally, the Government alleges that Anthony Dodd "did testify about an agreement and understanding between Fred Dodd and Joseph Dodd that Fred would provide crack to him as well as Anthony." Gov't Resistance at 3. However, Anthony Dodd, like every other witness offering testimony adverse to Joseph Dodd, did not identify a single occasion when Joseph Dodd actually sold crack to another individual. In fact, Anthony's testimony was peppered with phrases to the effect of "I believe he was selling" and he "sometimes got enough to sell," but with no identification of times, places, quantities, the basis for his beliefs, or about any agreement with Frederick Dodd or other alleged conspirators.

In sum, not one witness stated with any certainty that Joseph Dodd was acquiring crack cocaine or powder cocaine from Frederick Dodd pursuant to any sort of agreement. While true that a conspiracy can be established by circumstantial evidence, the Court cannot accept the proposition that an individual who buys controlled substances for personal use and who occasionally sells or shares quantities in furtherance of his own habit, necessarily has reached some sort of agreement with the original seller sufficient to constitute a conspiracy to distribute controlled substances. Indeed, if this proposition were true, the lines to the Courthouse would be never-ending as nearly every drug user could be readily convicted of conspiring with his or her dealer to violate the controlled substance laws of the United States. The Court does not believe that this scenario represents the evil that Title

21, United States Code, Section 846 was designed to address.

In short, the Court finds that the testimony adduced at trial, as it related to Joseph Dodd, was lacking in the sort of detail and consistency necessary to sustain a conviction for conspiracy to distribute controlled substances. Equally troubling is what the evidence *did not* show at trial. That is, the evidence did not reveal any fingerprints on any of the physical evidence linking it to Joseph Dodd, including baggies, baby food jars, a gun, and an electronic scale. The bag of cocaine found by Officers Edwards and Starks was destroyed prior to trial and was never tested for crack cocaine, as opposed to powder. Indeed, the quantity of alleged crack cocaine discovered by those officers was no more than 2.8 grams, an amount which, while salable, is still a small enough quantity to be consistent with personal use. Additionally, the alleged crack cocaine was not packaged for distribution and no individual at trial ever saw Joseph Dodd with individually packaged crack cocaine. Sharon Stokes' and George Butler's testimony revealed that when Joseph Dodd "distributed" crack to them, he generally just broke a chunk off of his own crack rock.

What's more, the evidence did not show any regular involvement between Joseph Dodd and Frederick Dodd. Joseph did not live at, and with minimal exceptions, the evidence did not show that he frequented any of the residences where Frederick Dodd was trafficking cocaine. Rather, he lived at a residence frequented by users of crack cocaine. Not one telephone record linked Joseph Dodd to the other members of the conspiracy. There is no evidence that Joseph accompanied Frederick on any procurement trips, assisted him in converting powder to crack cocaine, weighed or packaged the drugs, stored the drugs, or

made deliveries or sales for Frederick. *See generally United States v. Jackson,* 345 F.3d 638, 648 (8th Cir.2003). Similarly, there is no evidence that Frederick had any idea that Joseph might be doing something other than using crack cocaine.

Finally, the Court is concerned that the overwhelming nature of the evidence against Joseph Dodd's nephew, Frederick, negatively impacted on the jury's ability to objectively view and independently analyze the evidence against Joseph Dodd. Through four days of testimony, the only evidence specifically pertaining to Joseph Dodd's involvement in the charged conspiracy totaled, in the Court's estimation, less than 2 hours of evidence. Witnesses who had information about Joseph Dodd were plagued by an inability to distinguish Joseph and Anthony Dodd. Yet, even the witnesses who had no knowledge of any drug activity by Joseph Dodd were put through the display of identifying him to the jury. At best, the Court finds the testimony presented at trial to be equivocal. At worst, it supports an inference that Joseph Dodd was a severely addicted individual who obtained crack cocaine from Frederick Dodd. This is insufficient to evidence an agreement or understanding to distribute controlled substances or that Joseph Dodd knowingly and intentionally joined in an agreement or understanding to distribute controlled substances. *See generally United States v. Fitz,* 317 F.3d 878 (8th Cir.2003).

## V. CONCLUSION

The Court concludes, based upon its review of the evidence, and for the reasons stated herein, that there exists a strong possibility a miscarriage of justice may have occurred in this case. Federal Rule of Criminal Procedure 33 provides that the Court may grant a new trial when the interests of justice so require. Case law

interprets the determination as one of discretion. When the term discretion is "invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to *what is right and equitable* under the circumstances and the law, and directed by the reason and conscience of the judge to a *just* result." *Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931) (emphasis added).

Since trial in this matter concluded, the Court has been left with a perpetual "bad taste" in its mouth over the nature, quantity, and character of evidence presented against Joseph Dodd. This does not mean to suggest in any fashion that the jurors in this case performed their civic obligation poorly. Rather, the Court believes parsing out the minuscule evidence against Joseph Dodd from the overwhelming evidence against his alleged coconspirators was a difficult, if not impossible task to perform. Indeed, the difficulty could only have been exacerbated by the fact that Joseph Dodd's alleged coconspirators were family members and by the fact that Joseph Dodd himself was a known crack addict with prior negative contacts with law enforcement. The Court will not rehash its analysis and concerns, stated amply *supra,* but will merely say it seems far too plausible that the jury verdict rested upon "guilt by association" or proof of guilt of a crime other than that charged in the indictment, rather than on evidence that meets the standards of certainty the law requires in criminal cases. The power to grant a motion for new trial should, admittedly, be exercised infrequently and with great caution. Nonetheless, the Court cannot accept the proposition that a verdict tainted by such concerns could qualify as right, equitable, or just. Accordingly, the Court finds that the facts and circumstances of this case constitute one of the rare occasions where a new trial is warranted in the interests of justice. The jury verdict as to Joseph Dodd is hereby set aside and his Motion for New Trial is GRANTED pursuant to Federal Rule of Criminal Procedure 33.

IT IS SO ORDERED